1  DAVID A. DIEPENBROCK (SBN 215679)
   W. SCOTT CAMERON (SBN 229828)
2  **weintraub tobin** chediak coleman grodin
   LAW CORPORATION
3  400 Capitol Mall, 11th Floor
   Sacramento, California 95814
4  Telephone:     916.558.6000
   Facsimile:     916.446.1611
5  Email: ddiepenbrock@weintraub.com
6           scameron@weinstraub.com

7  Attorneys for Plaintiff,
   SIERRA NORTHERN RAILWAY
8

9              **UNITED STATES DISTRICT COURT**

10             **EASTERN DISTRICT OF CALIFORNIA**

11

12  SIERRA NORTHERN RAILWAY,              Case No.:

13              Plaintiff,

14       vs.                              **COMPLAINT FOR
                                          (1) DECLARATORY JUDGMENT
15  PORT OF WEST SACRAMENTO and           (2) QUIET TITLE
    RAMCON ENGINEERING &                  (3) EQUITABLE ESTOPPEL
16  ENVIRONMENTAL CONSULTING, INC.,       (4) FIFTH AMENDMENT TAKING**
    a California corporation,
17                                        DEMAND FOR JURY TRIAL
18              Defendants.

19

20

21

22

23

24

25

26

27

28

{4352186.DOCX:2}

For its Complaint against Defendants Port of West Sacramento ("Port") and Ramcon Engineering & Environmental Consulting, Inc. ("Ramcon"), collectively "Defendants," Plaintiff Sierra Northern Railway ("Plaintiff" or "SNR") alleges as follows:

## INTRODUCTION

1.     SNR is a federally certified common carrier railroad, operating in connection with other common carriers that originate the line haul interstate freight rail service.  SNR acquired title to an 18.865-acre parcel of real property ("**Subject Property**") from the Port of West Sacramento under a Purchase and Sale Agreement, dated February 15, 2012, and a Grant Deed recorded pursuant thereto, on June 1, 2012.  SNR acquired a deeded access to the southern end of the Subject Property in 2012, but the General Manager for the Port, Rick Toft, agreed that SNR could use a shorter access route ("**North Access**") to reach its rail facilities on the Subject Property, giving SNR full control over the North Access. SNR began using the North Access in or around in or around 2017.

2.     In reliance on the Port's General Manager giving SNR unfettered use of the North Access, SNR developed its rail facilities at the northern end of the Subject Property.  Currently, and as a result of decisions and actions taken by the Port and the City of West Sacramento, SNR's only feasible means of accessing its rail yard on the Subject Property is by using the North Access.  Until May of this year, the Port did not place any conditions or limitations on SNR's use of the North Access. Only after SNR had entered into a lease with Flatiron Contractors, Inc., a construction company performing essential work on Highway 50, and after Flatiron had installed improvements that create a physical barrier to creating a new access road that would connect the deeded south access to the SNR's rail yard, did Defendants begin objecting to SNR's use of the North Access. Now, with full knowledge of SNR's lease with Flatiron, the Port and its tenant, Ramcon, have declared that they will no longer allow SNR, its customers, and its employees to use the North Access, depriving SNR of the use and operation of its rail facilities on the Subject Property, and interfering with the flow of interstate commerce.  To protect its rights, to continue serving its rail customers, and to restore and preserve the movement of interstate commerce that has moved into and out of SNR's West Sacramento rail yard since June 2020, SNR brings this action seeking to restore the movement of interstate commerce serving the Sacramento region.

weintraub **tobin** chediak coleman grodin
law corporation

**PARTIES**

3.      SNR is a California corporation, headquartered in Davis, California, and with a substantial business office and railway operation in West Sacramento.

4.      Defendant Port of West Sacramento ("Port") is an independent special district located in West Sacramento, California.  The Port is a governmental entity, created by the state of California, and managed by the City of West Sacramento.

5.      Defendant Ramcon Engineering & Environmental Consulting, Inc. ("Ramcon") is a California corporation with its principal place of business in West Sacramento, California.

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, in that a federal question exists based on 49 U.S.C. §10501(b) because this action necessarily affects the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. §§10101 *et seq.*, and Defendants are interfering with SNR's property rights and interests in and to the North Access.  The Court has supplemental jurisdiction over SNR's state law claims.

7.      The claims presentation requirements of California's Government Claims Act are inapplicable to (i) claims for non-monetary relief brought under state law, and (ii) claims seeking monetary or non-monetary relief under 42 U.S.C. § 1983.

8.      This Court has personal jurisdiction over Defendants.  On information and belief, Defendants transact business in the state of California by, among other things, performing governmental functions, operating, and otherwise furnishing services or selling goods in this state and within this judicial district.

9.      Venue is proper in this judicial district because Defendants are subject to personal jurisdiction in this district.  Defendants maintain their principal places of business in this district. The conduct complained of herein also occurred within this district.

**FACTUAL ALLEGATIONS**

**A.      SNR's Railroad Business**

10.     Railroads like SNR, which operate in the United States as part of interstate commerce, are governed by the United States Surface Transportation Board ("STB").  This is so even if the

weintraub **tobin** chediak coleman grodin
law corporation

railroad provides services solely within one state.  As such, SNR's railroad operations, including its tariffs and other rates, operating rules, practices, routes, services, facilities, and the other transportation services that are related to the movement of property are subject to the exclusive jurisdiction of the STB.  The STB has established three classification levels of railroads (Class I, Class II, and Class III), which are determined by the STB primarily based upon their annual operating revenue.  As relevant here, Class I railroads (such as Union Pacific Railroad ("UP") and BNSF Railway ("BNSF"), and also known as main line railroads) are the largest and generally operate nationwide.  Class III railroads (such as SNR), also called short line railroads, are the smallest and generally operated locally. Class III railroads are commonly referred to as the first mile and the last mile of the rail transportation network.

11.     As a STB regulated railroad, SNR is a public utility common carrier Class III railroad that provides freight railroad services across California.  As a STB regulated common carrier railroad, SNR's rates, operating rules, practices, routes, services, facilities, and other transportation services related to the movement of property, are subject to the exclusive jurisdiction of the STB. As a common carrier, with certain exceptions, SNR is obligated to provide freight transportation upon reasonable request and may not refuse to provide service merely because to do so would be inconvenient or unprofitable.

12.     Urban development has rendered it infeasible (physically and/or economically) for railroads to construct tracks to all customers who need railroad transportation services.  Railroads have addressed this problem by developing transloading facilities, and offering transloading services, to customers who need railroad services. Transloading facilities consist of locations where railroads transfer (transload) freight from one mode of transportation to another (such as between train cars and trucks) *en route* to the freight's ultimate destination, often with an intermediate step of temporarily storing the freight onsite while waiting for further transportation. A railroad transload operation is inextricably related to the transportation of property by a railroad.

**B.     SNR's Acquisition and Use of the Subject Property**

13.     On or around June 1, 2012, SNR acquired title to the Subject Property from the Port under a Purchase and Sale Agreement, dated February 15, 2012, and a Grant Deed recorded pursuant

thereto.  A true and correct copy of the Grant Deed is attached hereto as **Exhibit A**. A true and correct copy of an Assessor's Parcel Map depicting the Subject Property and the adjacent parcel, which is still owned by the Port, is attached hereto as **Exhibit B**.

14.   The Subject Property was vacant (bare ground) in 2012. SNR's original plans to develop the Subject Property were rendered impossible by deliberate decisions by the City of West Sacramento ("City"), of which the Port is a subdivision.  In response to the City's and Port's actions and decisions, SNR was forced to pursue a different plan, where all of SNR's improvements on the Subject Property are grouped in the northern section of that 18.865-acre parcel, and rely on direct access to the northern section of the Subject Property.

15.   As a consequence, SNR's President and Chief Executive Officer, Kennan H. Beard III, began discussions with Rick Toft, who was then and still is the General Manager for the Port, about access to the Subject Property.  In or around 2017, Mr. Toft agreed that SNR could use the North Access to reach the Subject Property. He placed no restrictions on SNR's use of the North Access when he removed the Port's lock on the gate securing the North Access, when SNR installed its own railroad lock on that gate, or at any time thereafter up to and including April 2024.

16.   After the Port agreed that SNR could use the North Access, SNR improved the Subject Property to include a locomotive repair facility, a track repair operation, and rail lines to move interstate commerce by rail. The hard costs SNR incurred to construct and install those improvements approach $2,000,000.  SNR located those improvements in reliance on the Port having granted SNR free and unrestricted use of the North Access. SNR placed those facilities into service, and they became operational as part of the national rail network in June 2020, after a Sacramento Area Flood Control Agency flood control project severed SNR's historic Woodland facility from that network.

17.   For over four (4) years, SNR, its employees and customers have used the North Access to access the Subject Property on a daily basis.  SNR employees who have used the North Access include mechanics who repair and maintain rail cars used to transport interstate commerce. Transloading operations occur on the Subject Property. Customers have also been using the North Access to access their rail cars, and to retrieve goods shipped by interstate rail to the Subject

**weintraub tobin** chediak coleman grodin
law corporation

Property. On average, 10-20 trucks enter and leave the Subject Property daily, carrying goods delivered by interstate rail to the Subject Property, using only the North Access.

### C.   SNR's Lease with Flatiron Contractors, Inc.

18.   In 2023, after SNR had installed all of its current improvements on the Subject Property, where it has had active transloading operations, a construction company called Flatiron Contractors, Inc. ("Flatiron") approached SNR about leasing a portion of the Subject Property. Flatiron had previously approached the Port about leasing Port property for use as an aggregate processing facility and concrete batch plant. After Flatiron first approached SNR, SNR spoke with Michael ("Mick") S. Ramos, and Rollo Stephens, the owner and site manager of the Port's tenant, respectively, of Defendant Ramcon. Ramcon leases a parcel of real estate from the Port that is immediately southeast of the Subject Property, which is identified by APN 067-180-060. SNR informed Mr. Ramos and Mr. Stephens that SNR would not even consider entering into a lease with Flatiron unless and until Ramcon first had an opportunity to negotiate a sublease with Flatiron. After Ramcon declined to enter into a sub-lease with Flatiron, and in reliance on SNR having been permitted to use the North Access without any restrictions, SNR entered into a lease agreement with Flatiron in June 2023 that conferred to Flatiron an exclusive use and occupancy of the southern portion of the Subject Property, encompassing approximately five (5) acres. The initial term of SNR's lease with Flatiron is 25 months, commencing on June 7, 2023 and extending through July 7, 2025. The aerial photograph attached as **Exhibit C** shows the area SNR has leased to Flatiron, as well as the North Access. As explained below, Flatiron's lease creates a legal and physical barrier to SNR using the South Access to reach its West Sacramento rail yard.

### D.   Defendants Prevent SNR from Using the North Access

19.   Almost a full year after SNR entered into its lease with Flatiron, and after SNR had been using the North Access with Port permission for at least six (6) years, the Port suddenly informed SNR in May 2024 that the Port would no longer allow SNR or its customers to use the North Access. The Port asserted that using the South Access was supposedly "the best path forward" with full knowledge that accessing SNR's rail yard from the South Access is no longer feasible.

/ / /

20.     The Port subsequently informed SNR that the Port and its tenant, Ramcon, were willing to allow SNR to access the north end of the Subject Property using a more direct route than the North Access that SNR had been using.  SNR's conversations with Defendants about SNR using the proposed alternate route continued through June 27, 2024.  As a result of these discussions, it was SNR's understanding and belief that the Port had withdrawn its May 2024 notice purporting to restrict SNR to the South Access.   However, on Friday, June 29, 2024, SNR received an email from Ramcon's owner, Mick Ramos, declaring that SNR's use of the North Access would be terminated on July 8, 2024, as follows:

> Ramcon will begin yard improvements the week of July 8th, 2024. These activities will involve closing off the informal access area as described in Rick Toft's email.

21.     As a consequence of SNR's lease with Flatiron, and the improvements Flatiron constructed on its leased premises, SNR's only currently feasible means of accessing its railyard on the Subject Property is by using the North Access or the alternate access shown in Exhibit D.  The aggregate processing facility and concrete batch plant Flatiron has constructed on its leased premises create a physical barrier to SNR using the South Access to access its railyard.

22.     Losing the North Access will cause irreparable harm to SNR and its customers and will interfere with SNR's rights and responsibilities to the public as a common carrier railroad.  SNR is required to provide rail service at reasonable rates and upon reason request by any person.  SNR's common carrier status comes with numerous other federal law rights and obligations as well.  *See* 49 U.S.C. §§10101 *et seq*. SNR's customers have been using the North Access to access their rail cars, and to retrieve goods shipped by interstate rail to the Subject Property.  On average, 10-20 trucks have been entering and leaving the Subject Property daily, carrying goods delivered by interstate rail to the Subject Property, using the North Access.  The South Access is not available to SNR or its customers to access the rail yard, which SNR constructed on the Subject Property in reliance on having the North Access available for ongoing use.

23.     If SNR is prohibited from using the North Access, SNR's short-line rail operations will substantially cease in and around the greater Sacramento region.  SNR's short-line rail operation facility is where all of SNR's locomotives and rail mounted equipment are maintained and repaired.

Without the ability to maintain its fleet of equipment, SNR's train and maintenance-of-way crews will not be able to perform their daily tasks or serve SNR's various railway customers in West Sacramento, customers that include Advanced Logistics (a railcar transloading, warehousing, and commodities distribution services), Lineage (a cold storage warehousing and distribution company), Stella Jones (a pressure treated lumber manufacturer), and Carbide Industries (a mineral producer and processer). Closure of SNR's railway facility would halt the movements of 10–20 truckloads of customer product daily, impacting a variety of industries throughout the region, including those in need of building materials, chemicals, minerals, and food supplies.

24.    Additionally, if SNR is prohibited from using the North Access, other customers who rely on SNR for rail switching services would be impacted as well.  Those customers include CEMEX (a global building materials company), Viper Railcar Storage (a short and long-term railcar storage facility, including hazardous and non-hazardous materials), Farmers' Rice (a grower-owned rice marketing cooperative), Phillips 66 (a petroleum processor), Marathon (a petroleum processor), Procter & Gamble (a commercial and household chemical processor), and Adams Grain (which merchandises and warehouses wheat, corn, safflower, barley, rice, and other grains).

25.    On July 4 and 5, 2024, SNR and the Port engaged in meet and confer efforts in an attempt to resolve this dispute without court intervention.  Defendants, however, refused to change their position.  SNR was forced to bring this action as a result.

## FIRST CLAIM FOR RELIEF

(Declaratory Judgment - 28 U.S.C. § 2201 Federal Preemption under ICCTA)

*Against All Defendants*

26.    Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the foregoing paragraphs as though fully set forth in this place.

27.    A justiciable controversy exists between the parties regarding Defendants' planned disruptions and interreferences with SNR's federal common carrier rights as an STB licensed carrier.

28.    Fed R. Civ. P. 57 and 28 U.S.C. § 2201 provide this Court with the authority to declare the rights and other legal relations of the Parties with respect to this controversy.

29.    Pursuant to the ICCTA, the actions undertaken by Defendants, preventing SNR's use

weintraub **tobin** chediak coleman grodin
law corporation

of the North Access, are specifically preempted by federal law and cannot be undertaken because they would substantially interfere with SNR's rail operations directly contrary to federal law.

30.     Specifically, under 49 U.S.C. § 10501(b):

"The jurisdiction of the [STB] over—

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive.  Except as otherwise provided in this part, the remedies provided under this part with respect to the regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."

31.     "Transportation" is broadly defined under ICCTA, 49 U.S.C. § 10102(9), and includes:

(A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

(B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange or passengers and property.

32.     ICCTA defines "rail carrier" in 49 U.S.C. § 10102(5) as a person providing common carrier railroad transportation for compensation, but does not include street, suburban, or interurban electric railways not operated as part of the general system of rail transportation.

33.     SNR is a "rail carrier" as defined in 49 U.S.C. § 10102(5).

34.     Defendants have declared their intent to block SNR's use of the North Access with full knowledge that accessing SNR's rail yard from the South Access is infeasible, and with full knowledge of the rail facilities SNR constructed in the northern section of the Subject Property in reliance on having unrestricted use of the North Access.  Defendants' actions will constitute

interreference with and regulation of SNR's operations in violation of Section 10501 of the ICCTA. Defendants' actions have the effect of exercising control over rail transportation in violation of ICCTA and are expressly preempted by the ICCTA.  See e.g., *Soo Line R. Co. v. City of St. Paul*, 827 F.Supp.2d 1017, 1022 (D. Minn. 2010); *Wisconsin Central Ltd. v. City of Marshfield*, 160 F. Supp. 2d 1009, 1013 (W.D. Wis. 2000); *Petition of Union Pacific Railroad Company for Declaratory Order*, FD 35960 (served Sept. 30, 2016); *Pinelawn Cemetery – Petition for Declaratory Order*, FD 35468 (served April 21, 2015).

35.    Defendants should be enjoined from any attempt to block or otherwise impede SNR's use of the North Access, and SNR's operations on the Subject Property, as any such attempts are *per se* preempted under the ICCTA. *See Soo Line R. Co. v. City of St. Paul*, 827 F.Supp.2d 1017, 1022 (D. Minn. 2010).

36.    SNR lacks an adequate remedy at law because damages for injuries SNR will sustain from Defendants' conduct, preventing SNR and its customers from using the North Access, are difficult, if not impossible, to determine, and the rights of numerous third parties are impacted.

WHEREFORE, SNR prays for judgment as set forth below.

**<u>SECOND CLAIM FOR RELIEF</u>**

(Quiet Title – Irrevocable License to Use North Access)

*Against All Defendants*

37.    Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the foregoing paragraphs as though fully set forth in this place.

38.    Beginning in or around 2017, the Port granted SNR use of the North Access without placing any conditions or limitations on SNR's use of the North Access.  SNR subsequently spent nearly $2,000,000 making improvements to the Subject Property in reliance on the Port having granted SNR unrestricted use of the North Access.

39.    As a result of the foregoing, and under the facts and circumstances alleged herein, SNR is entitled to an irrevocable license entitling SNR to use the North Access for ingress to and egress from the Subject Property.  *See e.g., See, e.g., Times-Mirror Co. v. Superior court of Los Angeles County*, 3 Cal.2d 309, 330 (1935) (applying equitable estoppel doctrine against a local

governmental entity); *HPT IHG-2 Props. Tr. v. City of Anaheim*, 243 Cal. App. 4th 188, 210-211 (2015) ("The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel."); *Cooke v. Ramponi*, 38 Cal. 2d 282, 286 (1952) (irrevocable license); *Higgins v. Kadjevich*, 186 Cal. App. 2d 520, 523-524 (1960) (same).

40.     SNR is informed and believes and thereon alleges that Defendants continue to claim a legal or equitable right, title, estate, license, interest, claim, or encumbrance to the North Access and that such claims are adverse to SNR's irrevocable license to use the North Access.

41.     SNR seeks to quiet title with respect to the North Access and to obtain a judgment of this Court that grants SNR an irrevocable license to use the North Access free and clear of any legal or equitable right, title, estate, license, interest, claim, or encumbrance of Defendants.

42.     SNR seeks to quiet title in and to the North Access as of July 10, 2024.

WHEREFORE, SNR prays for judgment as set forth below.

## THIRD CLAIM FOR RELIEF

(Equitable Estoppel)

*Against All Defendants*

43.     Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the foregoing paragraphs as though fully set forth in this place.

44.     SNR improved, developed, maintained, and constructed on the Subject Property in reasonable reliance on the Port having granted SNR use of the North Access to the Subject Property without placing any conditions or limitations on SNR's use of the North Access.

45.     With Defendants' full knowledge, SNR granted a lease to Flatiron in 2023 that preludes SNR from accessing the Subject Property using the deeded South access.  Only after SNR had entered into that lease did Defendants begin objecting to SNR's use of the North Access.

46.     Under the exceptional circumstances alleged herein, Defendants are estopped and barred from contesting the validity of, or materially interfering with, SNR's rights and interest in

1    using the North Access.

2        47.    SNR will suffer irreparable injury unless the Court estops Defendants from blocking

3    or otherwise impeding SNR's use of the North Access.

4        WHEREFORE, SNR prays for judgment as set forth below.

5                           **FOURTH CLAIM FOR RELIEF**

6                (42 U.S.C. § 1983 – Unlawful Taking of Railroad Property)

7                          *Against the Port of Sacramento*

8        48.    Plaintiff re-alleges and incorporates by reference each of the allegations set forth in

9    the foregoing paragraphs as though fully set forth in this place.

10       49.    The Port is an independent special district, and is a state actor within the meaning of

11   42 U.S.C. § 1983.

12       50.    The Due Process Clause of the Fifth and Fourteenth Amendments to the U.S.

13   Constitution protects against state actors taking private property without just compensation. Federal

14   courts have for generations construed 42 U.S.C. § 1983 to allow courts to enjoin state actors from

15   engaging in conduct that deprives parties of rights afforded under the Due Process Clause of the

16   Fifth and Fourteenth Amendments to the U.S. Constitution.

17       51.    As alleged herein, SNR holds an irrevocable license for ingress and egress to the

18   Subject Property, to wit:  the North Access.  Under California law, irrevocable licenses constitute an

19   interest in real property, akin to an easement.  California law further provides that substantial

20   interference with a property owner's rights of access to its property, even on a temporary basis,

21   constitutes a taking or damaging of property in violation of art. I, § 19 of the California Constitution.

22       52.    As alleged herein, the Port, acting under color of state law, has interfered with SNR's

23   business operations, including by depriving SNR, its employees, and its customers from using the

24   North Access, thereby depriving SNR of legally-cognizable property interests, and constitutional

25   rights, all of which wrongful conduct violates SNR's rights under 42 U.S.C. § 1983.

26       53.    As a direct and proximate result of Defendants' wrongful conduct, as alleged herein,

27   SNR has been damaged, and is suffering irreparable harm.

28       54.    SNR is entitled to recover attorneys' fees under 42 U.S.C. § 1988.

weintraub **tobin** chediak coleman grodin
law corporation

WHEREFORE, SNR prays for judgment as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, SNR respectfully requests that the Court grant the following relief:

1.       Declare that Defendants' actions in preventing SNR from using the North Access of the Subject Property are preempted by the United States Constitution and the ICCTA and would discriminate against and unduly burden interstate commerce, and would otherwise regulate railroad operations in violation of the ICCTA.

2.       Enter quiet title judgment in favor of SNR and grant SNR an irrevocable license to use the North Access for ingress to and egress from the Subject Property.

3.       Enjoin Defendants, and each of them, as well as all persons and entities acting in concert with either or both of them, from taking any action(s) that would materially interfere with SNR's use of the North Access for ingress to and egress from the Subject Property.

4.       Award attorney's fees on the Fourth Claim for Relief under 42 U.S.C. § 1988.

5.       Enter an Order for any additional or further relief as allowed by law or determined to be just and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, SNR demands a trial by jury on all claims and issues so triable.


Dated:  July 10, 2024                **weintraub tobin** chediak coleman grodin
                                       LAW CORPORATION


                                       By:      */s/ David A. Diepenbrock*
                                                David A. Diepenbrock
                                                Attorneys for Plaintiff
                                                Sierra Northern Railway

# EXHIBIT A



OFFICIAL BUSINESS:
~~Document entitled to free recording~~
~~Per Government Code section 27383.~~

YOLO Recorder's Office
Freddie Oakley, County Recorder
**DOC- 2012-0017377-00**
Acct 104-Placer Title
Friday, JUN 01, 2012 10:13:00
Ttl Pd $1,713.00      Nbr-0000985541
VRB/R6/1-14

**Recording Requested By and
When Recorded, Mail This Document
and Tax Statements To:**

Sierra Northern Railway
221 lst Street
Davis, CA 95616

---

### GRANT DEED

---

TITLE ORDER NO. 304-6030      ESCROW NO. 304-6030      APN: 067-180-045

~~THIS TRANSACTION IS EXEMPT FROM CALIFORNIA DOCUMENTARY TRANSFER TAX
PURSUANT TO SECTION 11922 OF THE CALIFORNIA REVENUE AND TAXATION CODE.
THIS DOCUMENT IS EXEMPT FROM RECORDING FEES PURSUANT TO SECTION
27383 OF THE CALIFORNIA GOVERNMENT CODE.~~   Transfer Tax: $1,650.00 full value

**MONUMENT FEE $ 10**

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**Sacramento-Yolo Port District**, a California river port district

hereby GRANTS to

**Sierra Northern Railway**, a California corporation

the following described real property in the City of West Sacramento, County of Yolo, State of
California, as described in Exhibit A and depicted in Exhibit B, reserving therefrom for the
benefit of Grantor (1) a 10-foot easement for construction, operation, installation, maintenance,
repair, and replacement of public utilities in, on, over, across, and under the Property as legally
described in Exhibit C and depicted in Exhibit D; and (2) a 30-foot exclusive easement for use,
construction, operation, installation, maintenance, repair, and replacement of railway track in,
on, over, across, and under the Property as legally described in Exhibit E and depicted in
Exhibit F.

Dated: May 29_____, 2012          TRANSFEROR:

                                     **Sacramento-Yolo Port District,**
                                     a California river port district

                                     By: _____
                                     Name: _MICHAEL W. LUKEN_____
                                     Title: _PORT MANAGER_____

1000862.1                          1                          

STATE OF CALIFORNIA                    )
                                       )
COUNTY OF _____*Yolo*_____             )

On _____, 2012 before me, _____, Notary Public, personally appeared _____*Michael W. Fuller*_____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument, the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the *foregoing paragraph is true and correct.*

WITNESS my hand and official seal.

_____
        NOTARY PUBLIC

[SEAL]

C. FULLER
Commission # 1888613
Notary Public - California
Yolo County
My Comm. Expires May 8, 2014

**Exhibit A to Grant Deed**

(See Attached Legal Description of Real Property)

### Exhibit "A"
### West Sacramento Lease Parcel
### Legal Description

All that certain real property situated in the North one-half of Section 5, T 8 N., R. 4 E., Mount Diablo Base and Meridian described as follows:

Commencing at City of West Sacramento monument G16-02 as shown on that certain Record of Survey filed in Book 13 of Maps and Surveys, at Pages 61-69, in the office of the Yolo County Recorder, from which City of West Sacramento monument E17-T2, as shown on said Record of Survey, bears South 67°59'33" East 4957.30 feet;

Thence, from said Point of Commencement, North 86°00'04" East 2654.69 feet to a point 80.00 feet south, at right angles, of the centerline of Industrial Blvd. (100' wide) said point also being the Point of Beginning;

Thence, from said Point of Beginning, parallel to the centerline of Industrial Blvd. the following Three (3) courses:

1) North 89°20'37" East 1.15 feet;
2) Along a 1420.00 feet radius tangent curve to the right, through a central angle of 40°04'06", 993.04 feet;
3) South 50°35'17" East 307.87 feet;

Thence South 39°24'43" West 897.10 feet;

Thence North 50°29'26" West 571.23 feet;

Thence North 11°02'16" West 624.81 feet;

Thence North 05°20'57" West 173.04 feet;

Thence North 09°48'28" West 63.33 feet to the Point of Beginning, containing 18.865 acres more or less.

All distances shown here on are ground distances.  To obtain grid distances multiply by 0.99995386.



K:\124900\legals\West Sac.docx

4

**<u>Exhibit B to Grant Deed</u>**

(See Attached Depiction of Real Property)



**EXHIBIT "B"**

West Sacramento - Lease Parcel
City West Sacramento, County of Yolo
State of California

**CenterPoint Engineering, Inc.**

Civil Engineering & Land Surveying
1217 Pleasant Grove Blvd, Suite 130 · Roseville, CA · 95678
Phone: 916-773-4005   Fax: 916-773-4498

| | |
|---|---|
| DRAWN BY: | BB |
| CHECKED BY: | MH |
| SHEET: | 1 OF 1 |
| DATE: | 11/17/2010 |

FILE: K:\124900\SURVEY\Exhibit_B - WEST_SAC.dwg

6

**Exhibit C to Grant Deed**

(See Attached Legal Description for Reservation of 10-foot Utility Easement)

## Exhibit "C"
## 10' Public Utility Easement
## Legal Description

All that portion of the North one-half of Section 5, T 8 N., R. 4 E., Mount Diablo Base and Meridian described as follows:

A strip of land 10.00 feet wide, the westerly and southwesterly line of which is described as follows:

Commencing at City of West Sacramento monument G16-02 as shown on that certain Record of Survey filed in Book 13 of Maps and Surveys, at Pages 61-69, in the office of the Yolo County Recorder, from which City of West Sacramento monument E17-T2, as shown on said Record of Survey, bears South 67°59'33" East 4957.30 feet;

Thence, from said Point of Commencement, North 86°00'04" East 2654.69 feet to a point 80.00 feet south, at right angles, of the centerline of Industrial Blvd. (100' wide) said point also being the Point of Beginning;

Thence, from said Point of Beginning, South 09°48'28" East 63.33;

Thence South 05°20'57" East 173.04 feet;

Thence South 11°02'16" East 624.81 feet;

Thence South 50°29'26" East 571.23 feet to the Point of Ending.

The Northerly terminus of the Easterly and Northeasterly sideline shall be at a line parallel to and 80.00 feet south of the centerline of Industrial Blvd.

The Southeasterly terminus of the Easterly and Northeasterly sideline shall be at a line that bears North 39°24'43" East from the above described Point of Ending.

Containing 0.328 acre, more or less.

All distances shown here on are ground distances.  To obtain grid distances multiply by 0.99995386.

**<u>Exhibit D to Grant Deed</u>**

(See Attached Depiction for Reservation of 10-foot Utility Easement)



**EXHIBIT "B" "D"**
10' Public Utility Easement
City West Sacramento, County of Yolo
State of California

**CenterPoint Engineering, Inc.**

Civil Engineering & Land Surveying
1217 Pleasant Grove Blvd. Suite 130 • Roseville, CA • 95678
Phone: 916-773-4006  Fax: 916-773-4490

DRAWN BY: BB
CHECKED BY: MH
SHEET: 1 OF 1
DATE: 11/17/2010

FILE: K:\124900\SURVEY\Exhibit B - WEST SAC-pue.dwg

10

### Exhibit E to Grant Deed

(See Attached Legal Description for Reservation of 30-foot Railroad Easement)

1000862.1

*E*

**Exhibit "A"**
**30' Railroad Easement**
**Legal Description**

All that portion of the North one-half of Section 5, T 8 N., R. 4 E., Mount Diablo Base and Meridian described as follows:

A strip of land 30.00 feet wide, the Northerly and Northeasterly line of which is described as follows:

Commencing at City of West Sacramento monument G16-02 as shown on that certain Record of Survey filed in Book 13 of Maps and Surveys, at Pages 61-69, in the office of the Yolo County Recorder, from which City of West Sacramento monument E17-T2, as shown on said Record of Survey, bears South 67°59'33" East 4957.30 feet;

Thence, from said Point of Commencement, North 86°00'04" East 2654.69 feet to a point 80.00 feet south, at right angles, of the centerline of Industrial Blvd. (100' wide) said point also being the Point of Beginning;

Thence, from said Point of Beginning, parallel to the centerline of Industrial Blvd. the following Three (3) courses:

1) North 89°20'37" East 1.15 feet;
2) Along a 1420.00 feet radius tangent curve to the right, through a central angle of 40°04'06", 993.04 feet;
3) South 50°35'17" East 307.87 feet; feet to the Point of Ending.

The Westerly terminus of the Southerly and Southeasterly sideline shall be at a line that bears South 09°48'28" East from the above described Point of Beginning.

The Southeasterly terminus of the Southerly and Southeasterly sideline shall be at right angles to the above described Northerly and Northeasterly sideline.

Containing 0.888 acre, more or less.


All distances shown here on are ground distances. To obtain grid distances multiply by 0.99995386.

K:\124900\legals\West Sac RR ease.docx

*12*

**<u>Exhibit F to Grant Deed</u>**

(See Attached Depiction for Reservation of 30-foot Railroad Easement)



END OF DOCUMENT

14

**EXHIBIT** B



This is an Assessor's Map (parcel map).

P.M. Bk. 2014, Pg. 20 - 25 - Pcl. Map No. 4000
Seaway International Trade Center

S.L.S. 1176, 272 296 261 & POR 247 331 797
POR. PROJ. SEC. 32, & 33, T.9N., R.4E., M.D.B.& M.
POR. PROJ. SEC. 4, & 5, T8N., R.4E., M.D.B.& M.

CAUTION - These Maps ARE NOT to be used for legal descriptions.

3 - FREEBOARD DR.
2 - STARBOARD DR.
1 - HALYARD DR.

M.S. Bk. 2008, Pg. 43 - 52 - Record of Survey,
Jefferson Blvd. Widening Project (Monumentation)
M.S. Bk. 2009, Pg. 26 - 44
Record of Survey - St. Hwy 84 -
( Monumentation Map )

M.&S. Bk. 7, Pg. 64 - Turner, Williams, Allen & Cebrian
M.&S. Bk. 7, Pg. 30 - A. F. Turner
State Appraisal Maps - Dist. III, Yolo ( 80 ) - P.M. 10.67 - 11. 5
Sac. - Yolo Port Dist. R/W Record of Survey, Pg. 2 & 3
M.& S. Bk. 5, Pg. 25 - Shell Oil Co. & Arthur F. Turner Tracts
M.& S. Bk. 07, Pg. 60 - Record of Survey

NOTE - Assessor's Block Number Shown in Ellipses.
Assessor's Parcel Number Shown in Circles.

(formerly all 9 - 35 added)
9 - 36
por. 9 - 30

CITY OF WEST SACRAMENTO
Assessor's Map Bk. 67, Pg. 18
County of Yolo, Calif.

19 / 20

**EXHIBIT** C

